## IN THE UNITED STATES DISTRICT COURT

## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THOMAS THOMPSON, | CASE NO. 3:13-cv-02605-MWB-GBC |
| Plaintiff, | (JUDGE BRANN) |
| v. | (MAGISTRATE JUDGE COHN) |
| CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, | REPORT AND RECOMMENDATION TO VACATE THE DECISION OF THE COMMISIONER AND REMAND THE CASE TO THE COMISSIONER FOR FURTHER PROCEEDINGS |
| Defendant. | |
| | Docs. 1, 7, 8, 9, 10 |

## REPORT AND RECOMMENDATION

### I.    Procedural Background

Thomas Thompson ("Plaintiff") twice applied for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-434.[1]

First, on March 4, 2009, Plaintiff protectively applied for DIB, alleging a disability

---

[1] Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." Plaintiff met the insured status requirements of the Social Security Act through September 30, 2014. (Tr. 11).

onset date of March 19, 2007.  (Administrative Transcript (Doc. 8), hereinafter, "Tr." at 48).  After the claim was denied at the initial level of administrative review (Tr. 48), the ALJ held a hearing on April 9, 2010.  (Tr. 48).  On May, 20, 2010, the ALJ found that Plaintiff was disabled within the meaning of the Act for a "closed period"[2] from January 1, 2008, through January 1, 2010.  (Tr. 48).  Lastly, the ALJ determined that beginning on January 2, 2010, medical improvement occurred, and Plaintiff had a residual functional capacity for a full range of sedentary work.  (Tr. 48, 55).

Plaintiff protectively filed the second DIB application, on August 30, 2010, alleging a disability onset date of January 4, 2008, due to pain in his neck, head, arm, hand, and right leg.  (Tr. 58).  Plaintiff's claim was denied at the initial level of administrative review.  (Tr. 75-79).  On July 10, 2012, the ALJ held a hearing at which Plaintiff, who was represented by an attorney, and a vocational expert appeared and testified.  (Tr. 24-43, 80-81).  On July 25, 2012, the ALJ found that

---

[2] In a "closed period" case, the decision maker determines whether a new applicant for disability benefits was disabled for a finite period of time which started and stopped prior to the date of the decision. *Townsend v. Sec'y U.S. Dep't of Health & Human Servs.*, 553 F. App'x 166, 168 (3d Cir. 2014); *accord Newbold v. Colvin*, 718 F.3d 1257, 1260 & n.1 (10th Cir. 2013); *Pickett v. Bowen*, 833 F.2d 288, 289 n. 1 (11th Cir.1987).

Plaintiff was disabled within the meaning of the Act from January 1, 2008, through January 1, 2010, but had not been disabled since January 2, 2010, through July 25, 2012, the date of the administrative decision (Tr. 19).

On August 14, 2012, Plaintiff filed a request for review with the Appeals Council (Tr. 6-7), which the Appeals Council denied on August 28, 2013, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner.  (Tr. 1-5).

On October 21, 2013, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) and pursuant to 42 U.S.C. § 1383(c)(3), to appeal a decision of the Commissioner of the Social Security Administration denying social security benefits.  (Doc. 1).  On January 28, 2014, the Commissioner ("Defendant") filed an answer and an administrative transcript of proceedings.  (Doc. 7, 8).  On March 14, 2014, Plaintiff filed a brief in support of the appeal (Doc. 9 ("Pl. Brief")).  On April 16, 2014, Defendant filed a brief in response.  (Doc. 10 ("Def. Brief")).  On November 5, 2014, the Court referred this case to the undersigned Magistrate Judge.  The deadline had passed for Plaintiff to file a reply brief.

## II. Relevant Facts in the Record

Plaintiff was born on September 14, 1962, and thus was classified by the regulations as a younger person through the date of the ALJ decision on July 25, 2012.[3]   20 C.F.R. § 404.1563 (c).   However, because at the time of the ALJ decision Plaintiff was within a few months of reaching the age of fifty, Plaintiff falls within the "borderline situation" contemplated by subsection (b), thus qualifying him as a "person closely approaching advanced age" under subsection (d) at the time of the ALJ decision.   20 C.F.R. § 404.1563 (b) through (c).   The highest level of education Plaintiff completed is the twelfth grade (Tr. 55, 73). Plaintiff's past relevant work includes working as a medical supply distribution associate, and distribution coordinator and team leader from April 1981 to January 2008.  (Tr. 73)  Plaintiff's past relevant work required frequently lifting 25 pounds and occasionally lifting 100 pounds.  (Tr. 55).

### A. Summary of Relevant Treatment Records for Closed Period of Disability from January 1, 2008 through January 1, 2010

---

[3] Plaintiff was 52 years old when he was last insured for benefits on September 30, 2014.  (Tr. 11, 55).

On March 19, 2007, Plaintiff sustained a work-related injury. (Tr. 52, 300, 313). Plaintiff was unloading trucks at his former job when he fell on ice, landing on his neck and the back of his head. (Tr. 52, 300, 313, 481). Plaintiff was taken to the emergency room where he was given some pain medications and released back to work. (Tr. 52, 300, 313, 481). However, Plaintiff continued to have problems with constant headaches and pain in his neck. (Tr. 52, 300, 313). From April 18, 2007, to February 27, 2008, Dr. Bernard M. Weintraub, M.D. treated Plaintiff with pain medications. (172-178). In a treatment record dated November 28, 2007, Plaintiff reported continued cervical pain radiating into his head despite treatment. (Tr. 174). In a treatment record dated January 10, 2008, Plaintiff reported experiencing radiating pain into his right shoulder and Plaintiff had to stop working. (Tr. 173). Dr. Weintraub sent the Plaintiff for an MRI of his cervical spine, which he underwent on February 19, 2008. (Tr. 173, 220-221, 621-622).

The February 2008 MRI revealed disc disease at the level of C5-C6 with a posterior disc herniation detected and a small focal disc herniation/disc osteophyte complex along the left posterior aspect of the disc space at C6-C7. (Tr. 621).

Specifically, Dr. Rebecca Johnson, M.D., concluded that at C5-C6, there existed a "moderate concentric disc bulge . . . with a super imposed broad-based left paracentral/left foraminal disc herniation . . . ."  (Tr. 622).  Dr. Johnson further concluded that there was "[e]xtruded disc material located within the left neural foramen results in mass-effect upon the exiting nerve root" in addition to "moderate right foraminal narrowing."  (Tr. 622).  From May 02, 2007, to July 16, 2008, Plaintiff underwent physical therapy with Donald Hubard, PT.  (Tr. 213-268).

From March 18, 2008, to August 19, 2008, Plaintiff underwent three epidural steroid injections (with Spine Surgery Associates & Discovery Imaging, P.C.: Drs. James W. Dwyer, Paul P. Vessa); however, his symptoms did not improve.  (Tr. 269-272, 474).  In a record from Somerset Surgical Center dated April 2, 2008, it was noted that after Plaintiff's first epidural steroid injection on March 18, 2008, Plaintiff experienced increased pain in the right shoulder and arm, had a temperature of 103 degrees, and went to the emergency department.  (Tr. 272).  During the emergency department visit, on March 25, 2008, Plaintiff underwent a CT scan, which showed degenerative changes in Plaintiff's lower

cervical region without any evidence of any spinal stenosis or neural foraminal stenosis. (Tr. 191-192, 291-292).

From March 20, 2007, to November 29, 2010, Plaintiff was under the primary care of Dr. J. Roberto Vergara, M.D., with Sussex County Medical Associates. (Tr. 421-493). In a treatment record dated October 23, 2007, Dr. Vergara noted that Plaintiff had persistent and recurring neck pain since the March 2007 injury and recommended that Plaintiff again consult Dr. James W. Dwyer (spine surgeon and physical therapy, see Tr. 272, 508), obtain a new MRI, or seek an additional pain management consultation. (Tr. 476). In a treatment record dated October 14, 2008, Dr. Vergara noted that Plaintiff's right temple was sensitive with a protruding vein. (Tr. 472). Dr. Vergara noted that Plaintiff had seen Dr. Valenza four times to address persistent neck and right temporal pain, and that Dr. Dwyer suggested that Plaintiff undergoes surgery. (Tr. 472). In subsequent visits, Plaintiff continued to report of headaches and neck pain. (Tr. 421-472).

In a treatment record dated March 30, 2009, Dr. Jennifer E. Horn, D.O. (with Sussex County Medical Associates) noted that Plaintiff was trying

acupuncture and had a history of trying three epidurals and two rounds of physical therapy. (Tr. 468). Plaintiff sought a second opinion regarding the necessity of neck surgery. (Tr. 468). Dr. Horn also observed that Plaintiff had "high doses of pain [prescription] over time [without] significant relief. [Plaintiff reported wanting] quality of life back, possibly wants to work again." (Tr. 468).

In a treatment record dated April 16, 2009, Plaintiff was evaluated by Dr. George S. Naseef, M.D., an orthopedic surgeon. (Tr. 313-314). Dr. Naseef summarized Plaintiff's treatment history and observed that Plaintiff had decreased sensation in his C6 dermatome, and decreased range of motion of his cervical spine by ten degrees. (Tr. 314). Comparing radiographs taken the day of the visit with those taken two years prior, Dr. Naseef noted that there had been advanced degenerative changes at the CS-6 level, with enlarged osteophytes. (Tr. 314). Dr. Naseef reviewed the 2008 MRI and found that it showed "moderate concentric disc bulge off to the left-hand side with extruded disc material in the neural foramen, as well as disc osteophyte complex, worse on the right than the left at C6-7." (Tr. 314). Dr. Naseef further noted that there was "neuroforaminal narrowing, however, off to the right-hand side at the C5-6 level." (Tr. 314). Dr. Naseef

concluded that Plaintiff had right upper extremity radiculopathy, and recommended a new closed MRI and an EMG of Plaintiff's bilateral upper extremities. (Tr. 314).

On April 30, 2009, subsequent MRI scanning of Plaintiff's cervical spine was performed. (Tr. 315). Dr. Rebecca Johnson, M.D., found that the April 2009 MRI showed evidence of interval progression of disc disease at the C5-6 level which was increasing the central canal and right neural foraminal narrowing secondary to the presence of a concentric disc bulging and superimposed bilateral foraminal disc herniation. (Tr. 315). According to Dr. Johnson, although the left foraminal herniation appeared stable, the right neural foraminal disc herniation appeared to have slightly increased which resulted in moderate-to-severe right foraminal narrowing without any cord compression. (Tr. 315). On May 7, 2009, EMG and nerve conduction studies were completed, and Dr. Neal R. Dunkelman determined that the studies did not reveal any evidence of radiculopathy or neuropathy. (Tr. 325-326). The findings were confirmed by Dr. Dwyer in a record dated May 13, 2009. (Tr. 322).

On May 13, 2009, Dr. Dwyer noted that Plaintiff continued to experience severe axial neck pain with radiation to the right occipital region, right interscapular pain, and right upper extremity pain. (Tr. 322). Dr. Dwyer noted that the symptoms remained severe despite exhaustive conservative treatment, including epidural injections, physical therapy, acupuncture, and pain management. (Tr. 322). Dr. Dwyer opined that Plaintiff remained totally disabled as he has been for several months due to his intractable pain and the significant MRI findings. (Tr. 322). Dr. Dwyer recommended that Plaintiff proceed with "anterior cervical discectomy and fusion or artificial disc replacement at the C56 level," in other words, neck surgery. (Tr. 322). Dr. Dwyer stated that after the surgery, it may be possible for Plaintiff to return to "some sort of gainful employment." (Tr. 322).

In a record dated September 24, 2009, Dr. Naseef recommended neck surgery and discussed the risks and benefits of surgical intervention including "bleeding, infection, need for further surgery, chronic pain, failure of the surgery to relieve the pain, pseudoarthrosis, blood clots, death, paralysis, and blindness." (Tr. 347). On September 28, 2009, Dr. Vergara cleared Plaintiff for neck surgery to be

performed by Dr. George Naseef on October 5, 2009.  (Tr. 463).  In a treatment record dated November 23, 2009, Dr. Horn noted that three days prior to the scheduled surgery date, Plaintiff decided not to have cervical fusion (neck surgery).  (Tr. 427).  Plaintiff also decided to try "IDD therapy" (Intervertebral Differential Dynamics Therapy) and manual manipulation with Drs. Shaw and Newton, having fifteen out of eighteen treatments as of the time of the record.  (Tr. 427).  Plaintiff reported improvement due to the alternate treatment and had discontinued all pain meds "abruptly" about one month prior to the November 2009 visit and was possibly experiencing withdrawal symptoms.  (Tr. 427).  In a record dated March 31, 2010, Dr. Vergara noted that Plaintiff had been doing well with his chiropractor, Dr. Shaw and spinal decompression.  (Tr. 225).  Dr. Vergara noted that Plaintiff chose to defer surgery given that he felt better due to decompression.  (Tr. 225).  Dr. Vergara concluded that Plaintiff still had cervical disc displacement without myelopathy.  (Tr. 225).

## B. Relevant Treatment History and Medical Opinions Relating to Disability after January 1, 2010

### 1. George S. Naseef, M.D. – Medical Questionnaire, March 8, 2010

In a medical questionnaire dated March 8, 2010, Dr. Naseef reported that he had treated Plaintiff from April 2009 to September 2009.  Dr. Naseef indicated that Plaintiff's diagnosis of cervical degenerative disc disease was objectively confirmed by an MRI taken on April 30, 2009, however, the diagnosis of upper extremity radiculopathy was not supported by an EMG taken on May 7, 2009, and the diagnosis of "cervical HNP" was not supported by an x-ray taken on April 16, 2009.  (Tr. 409).  In response to a question regarding symptoms or limitations that would preclude Plaintiff from engaging in sustained gainful work, Dr. Naseef replied "discogenic pain, degenerative changes and upper extremity radiculopathy."  (Tr. 409).

## 2. Sussex County Medical Associates: J. Roberto Vergara, M.D.; Jennifer E. Horn, D.O. – Treatment Records, from May 31, 2010, to November 24, 2010

In a record dated March 31, 2010, Dr. Vergara noted that Plaintiff had been doing well with his chiropractor, Dr. Shaw and spinal decompression.  (Tr. 425). In a telephone message dated November 24, 2010, Plaintiff reported that he had been doing IDD therapy for his back problems, but workman's comp will no

longer pay.  (Tr. 462).  Plaintiff reported that although he did not need pain medication while he underwent the IDD therapy, after discontinuing IDD therapy, the pain returned.  (Tr. 462).

In a report dated November 29, 2010, Plaintiff complained of neck pain. (Tr. 421).  Dr. Vergara noted that Plaintiff had been seeing Dr. Shaw two to three times weekly for chiropractic adjustments and had been getting relief from the adjustments.  (Tr. 421).  Dr. Vergara noted that Plaintiff has not had any pain medications for the past year with the exception of occasionally taking Advil for his neck and right-sided discomfort.  (Tr. 421).  In the March 2010 and November 2010 records, Dr. Vergara concluded that Plaintiff still had cervical disc displacement without myelopathy.  (Tr. 421).  Dr. Vergara observed no posterior tenderness in the spine.  (Tr. 422).

### 3.  Barry Kurtzer, M.D. – Consultative Examination Report, January 27, 2011

In a report dated January 27, 2011, Dr. Kurtzer summarized Plaintiff's medical history since his fall on March 18, 2007.  (Tr. 551).  Dr. Kurtzer noted that in spite of trying physical therapy, epidurals and treatment at the Kessler

Institute, Plaintiff still complained of neck, arm, and shoulder pain, particularly on the right side. (Tr. 551). Dr. Kurtzer noted that although Plaintiff's current chiropractic treatments somewhat helped, Plaintiff reported continued pain in spite of the IDD (spinal decompression). (Tr. 552). Plaintiff also reported that he believed that he was unable to work. (Tr. 552). A multivitamin was the only medication listed. (Tr. 552). Dr. Kurtzer observed that there was tenderness on the lateral movements of Plaintiff's neck and tenderness on the cervical spinal muscles. (Tr. 553). Dr. Kurtzer observed that Plaintiff had "full range of motion, however, there [was] some pain elicited." (Tr. 553).

### 4. Robert M. Pearl, D.C. (Chiropractor) – Practitioner's Report of Independent Medical Evaluation, June 24, 2011

In an independent medical evaluation dated June 24, 2011, Dr. Pearl summarized Plaintiff's medical history. (Tr. 616). Dr. Pearl stated that he reviewed records from Dr. Shaw. (Tr. 617). Plaintiff reported that his past treatment included twenty sessions of decompression therapy from Dr. Shaw, a chiropractor. (Tr. 616). Plaintiff reported that while the decompression treatment from Dr. Shaw provided some relief, after he discontinued, his symptoms returned.

(Tr. 616).   Plaintiff reported seeing Dr. Gugleman for pain management as well as another doctor for pain management.   Plaintiff reported that he was also contemplating having neck surgery.  (Tr. 616).

Dr. Pearl noted that at the time of the examination, Plaintiff was not taking any medications for any chronic diseases.  (Tr. 617).  Although Plaintiff stated a history of falling and injuring his cervical spine in March 2007, Dr. Pearl also indicated that Plaintiff did not have any history of prior injuries or accidents. *Compare* (Tr. 616) *with* (Tr. 617).   Dr. Pearl noted current symptoms of back, head, and right arm pain with associated numbness and weakness.   (Tr. 617). Upon cervical examination, Dr. Pearl observed: 1) flexion was reduced to 40 degrees (normal is 45 degrees); 2) left lateral bending was reduced to 35 degrees (normal is 40 degrees); 3) right lateral bending was reduced to 30 degrees (normal is 40 degrees); 4) extension was reduced to 50 degrees (normal is 55); 5) left rotation was normal; and 6) right rotation was reduced to 60 degrees (normal is 70 degrees).  (Tr. 617).

Dr. Pearl observed that Plaintiff's deep tendon reflexes of the biceps, brachioradialis, and triceps were within normal limits; there was a decreased

sensation in the right arm as compared to the left; and motor muscle testing of the biceps, lateral deltoid, and intrinsic muscles of the hands were within normal limits.  (Tr. 617).  Dr. Pearl also observed that there was a mild spasm in the paraspinal musculature at the level of C3 to C7, as well as the right trapezius area.  (Tr. 618).  Dr. Pearl concluded that: Plaintiff had cervical radiculopathy from herniated discs; Plaintiff's disability was "moderate/marked;" and Plaintiff's prognosis was "poor."  (Tr. 618).

Dr. Pearl opined that: Plaintiff had a fair course of chiropractic care, which did not resolve his condition; this case was not a chiropractic case and no further chiropractic care was indicated; and due to the length of the case, it had become a chronic case that did not warrant continued care under New York State Workers' Compensation.  (Tr. 618).

### 5.  Kevin M. Shaw, D.C. – From January 2, 2010, to April 10, 2012

In a treatment record dated January 2, 2010, Dr. Shaw noted that Plaintiff had been good since the last visit (December 29, 2009, Tr. 683).  (Tr. 684).

In a "letter of medical necessity for continued care," dated January 4, 2010, Dr. Shaw summarized Plaintiff's history of neck-related symptoms and his

chiropractic treatment of Plaintiff.  (Tr. 641).  Dr. Shaw stated that the current course of treatment included spinal adjustments, facilitated stretches to multiple spinal and extra spinal areas, and that this treatment was required to "continue to reduce MM contracture and to re-establish normal articular, muscular and neurologic tone." (Tr. 641-642).  Dr. Shaw opined that "[c]ontinued progress and full resolution of complaints [was] expected . . . . [and] to date demonstrated significant reductions of complaints as follows, no headaches or medications for weeks, upper extremity complaints are near resolved [with] intermittent issues of the right upper back and neck, but significantly reduced in intensity and frequency." (Tr. 642).  Dr. Shaw elaborated that:

> [i]nitial complaints were of an intensity of constant at a 7-10, this is now reduced to intermittent mild pain due to over exertion. Right upper extremity and neck are still vulnerable to achiness and numbness on over exertion, complaints no longer interrupts sleep and doesn't limit his activities as once did. [As] Patient continues to stabilize, more care is required [and] it is expected that around 3/1/09 patient is likely to be reduced to [1 chiropractic visit] weekly based on current level of progress.

(Tr. 642).  Dr. Shaw noted that Plaintiff received "a conservative non-surgical option to treatment . . .  through IDD therapy and corrective chiropractic care" and

that Plaintiff's status was "markedly improved." (Tr. 642). Dr. Shaw added that in his opinion and in Plaintiff's opinion, surgery was not required nor was it likely at any time to be required. (Tr. 642). According to Dr. Shaw, Plaintiff continued to stabilize, required more treatment was likely to be "permanent and stationary" in the next six to twelve weeks with a partial disability. (Tr. 642). Dr. Shaw concluded that at the time of the letter, Plaintiff was not capable of gainful employment, and had been totally disabled; however, likely to return to the work force in the coming weeks. (Tr. 642).

In twice-weekly visits to Dr. Shaw from January 2010 to March 2010, Plaintiff's symptoms continued with repeated flare-ups of neck pain and headaches, and Dr. Shaw mostly noted improvement in Plaintiff's condition. (Tr. 696-718).

In a questionnaire for the Hartford Life Insurance Company dated March 25, 2010, Dr. Shaw reported the extent of Plaintiff's functional capacities. (Tr. 862-863). According to Dr. Shaw, Plaintiff could sit for two to three hours a day, walk for two to three hours a day, and stand for two to three hours a day. (Tr. 683). Plaintiff had the following restrictions in carrying and lifting: 1) no restriction to

bilaterally lift or carry one to ten pounds and could frequently carry eleven to twenty pounds; 2) frequently carry 21 to 50 pounds with the left arm and occasionally with the right arm; 3) occasionally carry 51 to 100 pounds with the left arm and never with the right arm; and 4) never lift/carry over 100 pounds in either arm.  (Tr. 683).  Dr. Shaw further opined that Plaintiff had no restrictions for bending at the waist, kneeling or crouching, or driving.  (Tr. 683).  Dr. Shaw indicated that Plaintiff could occasionally reach above the shoulder with his right arm and frequently with his left arm, and had no restrictions reaching with either arm at waist level or below the waist.  (Tr. 683).  Dr. Shaw also indicated that Plaintiff had no restrictions with gross or fine motor skills of the hands.  (Tr. 683).

On May 22, 2010, in response to follow-up questions from the Hartford Life Insurance Company, Dr. Shaw indicated that Plaintiff was capable of lifting twenty pounds with both arms; there was a deficit in the right arm, occasionally Plaintiff could reach above his shoulder with his right arm, and that Plaintiff should not lift beyond fifty pounds with his right hand more than occasionally.  (Tr. 880).

In a questionnaire dated March 25, 2010, Plaintiff indicated what changes he had in symptoms for which he originally sought relief.  (Tr. 870).  Plaintiff

indicated that all of his symptoms were "better," including: headaches, numbness in fingers, dizziness, stress, loss of balance, sleeping problems, neck pain, neck stiffness, and shoulder pain.  (Tr. 870).

In twice-weekly visits to Dr. Shaw from April 2010 to July 2010, Plaintiff's symptoms continued with repeated flare-ups of back, shoulder, and neck pain; stiffness; numbness in his arm; and headaches, and Dr. Shaw overall noted improvement in Plaintiff's condition.  (Tr. 720-750).

In treatment records from October 2010 to January 2011, Plaintiff repeatedly reported experiencing pain and or stiffness in the neck and shoulders, with occasional headaches, and occasional exacerbation of symptoms upon physical activity.  (Tr. 751-761, 763, 765, 767-770).  Sometimes, Plaintiff reported theories of what exacerbated his symptoms, such as helping his parents around the house or cold weather.  (Tr. 751, 752).  Plaintiff reported that when he lifts, he felt pressure in the neck and base of skull, and headache right side.  (Tr. 751).  In treatment records from October 28, 2010, to December 14, 2010, Dr. Shaw frequently made the same observations that Plaintiff exhibited palpated misalignment in the cervical spine and the thoracic spine; tenderness of the occipital muscles on the right; and

hypertonic musculature in the occipital muscles and the trapezius muscle; or muscle spasm in the trapezius muscle, the rotator cuff, and the thoracic paravertebral muscles; and muscle tightness (sometimes "contracture") in the paracervicals, muscles of the posterior shoulder, and the thoracic paravertebral muscles.  (Tr. 751-761, 763, 765, 767-770).

In a treatment record dated January 13, 2011, Plaintiff reported exacerbation of symptoms from shoveling snow and digging in the frozen ground.  (Tr. 770). Plaintiff reported that a little bit of exertion would aggravate his neck and upper back on the right side, while rest and the chiropractic adjustments seem to alleviate the symptoms.  (Tr. 770).  During the January 13, 2011, treatment, Dr. Shaw made similar observations as in the past months that Plaintiff exhibited tenderness of the occipital muscles, and aggravated right thoracic paravertebral muscles; aggravated muscle contracture the right trapezius muscle; and palpated joint restriction the cervical spine and the thoracic spine.  (Tr. 770).

In a treatment record dated January 20, 2011, Plaintiff complained of neck, shoulder, upper back and right arm pain.  (Tr. 771).  Plaintiff reported that turning his head for one hour at a meeting aggravated his symptoms and he experienced

"killing" pain in the neck and upper back for a few days.  (Tr. 771).  Plaintiff said

that the snow may have also been a factor in aggravating his pain symptoms.  (Tr.

771).  Dr. Shaw noted similar observations of Plaintiff's condition recorded in

previous visits.  (Tr. 771).  In a treatment record dated January 25, 2011, Plaintiff

complained of "awful" pain at the base of the skull, forehead and right side.  (Tr.

772).  Dr. Shaw opined that Plaintiff "demonstrate[ed] as a permanent partial

disability."  (Tr. 772).  In addition to the usual observations, Dr. Shaw noted that

Plaintiff was extremely restricted in the right upper cervical region and proved to

be difficult to adjust.  (Tr. 772).

In treatment records in February 2011, Plaintiff complained of the same

symptoms of a headache at the base of the skull and throughout the head.  (Tr. 773-

775).  Plaintiff reported that shoveling the snow caused his neck and upper back to

tense up and give him a headache.  (Tr. 773).  Dr. Shaw observed that Plaintiff had

muscle spasms in the trapezius muscle, the occipital muscles, and the paracervicals

on the right.  (Tr. 773).  In an examination dated March 24, 2011, Dr. Shaw

indicated that Plaintiff was not currently working, and could not return to work in

order to prevent exacerbating his symptoms and prevent limitations with normal activities. (Tr. 629).

In a letter dated March 30, 2011, to the State of New York's Workers' Compensation Board, Dr. Shaw wrote that Plaintiff continued to receive treatment for his disc injury and continued to suffer from frequent exacerbations and limitations due to ordinary daily activities. (Tr. 627). Dr. Shaw opined that with the history of complaints and the nature of Plaintiff's condition, this was a "permanent and stationary condition" and a "permanent partial disability remains." (Tr. 627). Dr. Shaw concluded that additional palliative care was required and advised vocational rehabilitation. (Tr. 627).

In treatments records from March 2011 to April 2012, with visits ranging once to twice per week, Plaintiff reported mostly the same symptoms, which oftentimes, appear to be copied verbatim from one visit to the next. (Tr. 775-859). Plaintiff's reported symptoms included: 1) headache of the sub-occipital, occipital, temporal, frontal regions of the head; 2) blurred vision; 3) sleep interrupted when rolling on right side; 4) neck pain radiating into the arm, forearm and hand; 5) pain, stiffness, achiness, and limited range of motion of the right shoulder and right

upper extremity; 6) upper back pain; and 7) pain of the muscles of the posterior shoulder, the deltoid muscle, exacerbated by physical activity and cold weather. Similarly, in treatments records from March 2011 to April 2012, Dr. Shaw's observations appear to be copied verbatim from one visit to the next. (Tr. 775-859). Dr. Shaw observed that Plaintiff had: 1) palpated joint restriction of the cervical spine; 2) extremely restricted right upper cervical spine; and 3) muscle contracture of the levator scapula muscles, the scapula thoracic muscles of the shoulder, the muscles of the upper back, and the trapezius muscle on the right. (Tr. 775-859).

In a treatment record dated September 13, 2011, in addition to reporting the usual symptoms of upper back and neck pain, Plaintiff stated that he went to pain management a couple weeks prior and was prescribed an antidepressant. (Tr. 818). However, Plaintiff reported that he didn't want to take an antidepressant and that he is not depressed, but rather was in pain. (Tr. 818). Plaintiff indicated that he was revisiting the idea of surgery to address his spine-related pain. (Tr. 818).

In a treatment record dated April 10, 2012, Plaintiff informed Dr. Shaw that he believed that he was regressing and that he was not benefiting from Dr. Shaw's

treatment as he did in the past.  (Tr. 860).  Plaintiff reported that over the last several months his condition had declined and that he planned to review treatment options with an orthopedist, including surgical options.  (Tr. 860).

### 6. Govindlal Bhanusali, M.D. (Orthopedic Surgeon) – Examination Report: April 6, 2010

In the April 2010 report, Dr. Bhanusali stated that he examined Plaintiff for over an hour and that Plaintiff drove 46 miles to participate in the examination. (Tr. 873).  Dr. Bhanusali observed that Plaintiff walked in the examination room without any limp and without any assistive device.  (Tr. 873).  Dr. Bhanusali also noted that he had evaluated Plaintiff in the past on June 11, 2008, and on March 4, 2009, making the April 2010 examination the third independent orthopedic examination.  (Tr. 873).  Dr. Bhanusali reviewed Plaintiff's extensive treatment history from various health care providers since the time of Plaintiff's injury.  (Tr. 873).

Plaintiff reported that he thought his symptoms had improved fifty percent since the last visit and that as of the day of the orthopedic examination, Plaintiff considered his cervical spine pain level to be five out of ten, with ten being the

worst.  (Tr. 874).  Plaintiff also reported feeling some pain in the right shoulder area at a level of five out of ten, with ten being the worst.  (Tr. 874).  At the time of the evaluation, Plaintiff did not take any pain medication and the last time he took medication for pain was maybe in the fourth week of March of 2010.  (Tr. 874). Dr. Bhanusali described that at the time of the examination, Plaintiff's treatment included chiropractor adjustments, deep tissue massage, perhaps laser surgery, IDD, and some yoga exercises.  (Tr. 874).  Dr. Bhanusali reviewed several of Plaintiff's medical records.[4]  (Tr. 874).

Upon examination of the cervical spine, Dr. Bhanusali observed that there was no muscle spasm; there was mild tenderness in the cervical spine diffuse in nature; and range of movement for forward flexion, extension, side rotation, and

---

[4] 1) an MRI of the cervical spine dated February 19, 2008; 2) X-rays of the spine taken in March 2007 and October 2009; 3) CAT scan of the head done on April 5, 2007; consultation from neurosurgeon Dr. Weintraub dated March 20, 2007, and July 16 2007; 4) independent neurological examination done by Dr. Ira Neustadt dated June 21, 2007; 5) neurosurgeon consultation by Dr. James Dwyer dated April 25, 2007; 6) follow up note from Dr. Dwyer, dated February 27, 2008, July 16, 2008, and November 19, 2008; 7) epidural steroid injections done on March 18, 2008, June 27, 2008, August 19, 2008; 8) office note from Dr. Roberto Vergara, dated October 14, 2008; 9) pain management consultation from Dr. Joseph P. Valenza; 10.chiropractor office notes from October 6, 2009 to February 6, 2010 from Dr. Kevin M. Shaw; 11) EMG/nerve conduction study of the upper extremities by Dr. Neal R. Dunkelman dated May 17, 2009. (Tr. 874).

side bending were within normal values.  (Tr. 875).  Dr. Bhanusali detailed that the axial compression and distraction tests were negative for pain in the cervical spine. (Tr. 875).  Upon examination of both shoulders, Dr. Bhanusali observed that range of movement was within normal range and painless including forward flexion, active abduction, internal rotation, external rotation, extension, and adduction.  (Tr. 875).  Dr. Bhanusali noted that both the Neer sign and Hawkins sign were negative for impingement syndrome condition in both shoulders.  (Tr. 875)

Dr. Bhanusali did not find any abnormalities after evaluating Plaintiff's arms, noting that Plaintiff is left hand dominant with grip strength of each hand of 100 pounds.  (Tr. 875-876).  Dr. Bhanusali also evaluated Plaintiff's thoracic spine, lumbosacral spine, hips, knees, ankles, and feet, all with unremarkable findings. (Tr. 876).  Dr. Bhanusali concluded that Plaintiff had a soft tissue injury of the cervical spine and recommended for Plaintiff to continue the home exercise program.  (Tr. 876).  Dr. Bhanusali opined that Plaintiff had reached maximal medical improvement as of the time of the examination, and that Plaintiff had a mild partial disability because of cervical spine pain and right shoulder pain.  (Tr. 876).

During the examination, Plaintiff stated that physical therapy exacerbated his symptoms.  (Tr. 876).  Plaintiff reported that at the time of the examination, he underwent chiropractor treatment two times per week and could do modified work as long as it did not require lifting more than fifteen pounds of weight and did not require bending, pushing or pulling, and strenuous physical activities.  (Tr. 877).

### 7.  Daniel Perri, M.D. – Examination Report, March 14, 2012

During the March 2012 examination, Dr. Perri summarized Plaintiff's history of medical symptoms and treatment.  (Tr. 885).  Plaintiff reported that he had seen two surgeons that had recommended cervical fusion (neck surgery).  (Tr. 885).  At the March 2012 examination, Plaintiff stated that he saw a chiropractor two times a week; however, the treatment was no longer helping.  (Tr. 885). During the examination, Plaintiff complained of constant neck pain, in addition to daily pain, weakness and paresthesias of the right upper extremity.  (Tr. 885). Plaintiff's symptoms are worse with activity and better with hydrocodone.  (Tr. 885).  Dr. Perri noted that he reviewed records from Dr. Joseph Valenza from 2011 and 2012, as well as a treatment record from Dr. Kevin Shaw from January 3, 2012.  (Tr. 886).

Upon evaluation, Dr. Perri observed that Plaintiff's cervical range of motion was within normal limits in all places, that there was no muscle spasm, no muscle atrophy, and no winging of the scapulae. (Tr. 886). Dr. Perri further observed that the scapulohumeral rhythm was normal bilaterally, upper extremity strength was five out of five bilaterally, and reflexes of the biceps, brachioradialis, and triceps were "2+ and symmetric." (Tr. 886). Dr. Perri noted that pinprick sensation was decreased in the entire right upper extremity and normal in the left upper extremity, and Plaintiff's gait and coordination was normal. (Tr. 886).

Dr. Perri concluded that with Plaintiff's neck pain, right-sided radicular complaints and headaches, that he had a moderate partial degree of disability. (Tr. 886). Plaintiff reported that future treatment included continuing pain medication and possibly surgery. (Tr. 886). Dr. Perri declined to give exact physical restrictions given that he had not been given the results of Plaintiff's diagnostic testing. (Tr. 886).

**8.  Joseph P. Valenza – Treatment Records from September 1, 2011, to March 23, 2012**

After a two year break in treatment since September 25, 2009, on September 1, 2011, Plaintiff returned for pain management treatment with Dr. Valenza. (Tr. 901). Dr. Valenza summarized Plaintiff's treatment history, including not following through with surgical intervention in 2009 and temporarily getting significant relief from chiropractic treatment. (Tr. 901). Plaintiff reported that he did not believe that cervical traction helped; however, he found that the IDD treatment helped. (Tr. 901). Plaintiff reported that his neck pain had continued to increase and reported the pain was at a level of five. Dr. Valenza prescribed Plaintiff a trial of Cymbalta starting at 20 mg once a day. (Tr. 901). Upon examination, Dr. Valenza noted that Plaintiff exhibited tenderness in the cervical paraspinals without any "true" muscle spasms, and no focal weakness in the bilateral upper extremities. (Tr. 901).

In a treatment record dated September 30, 2011, Dr. Valenza noted that since Plaintiff's insurance would not cover Cymbalta, he would prescribe hydrocodone 10/325 mg one-half to one tablet no greater than four times a day. (Tr. 900). Plaintiff reported that his level of pain was as high as seven to eight and that he was waiting for surgical intervention with Dr. Naseef. (Tr. 900).

In a treatment record dated October 27, 2011, Plaintiff reported waiting for a second opinion before undergoing a surgical intervention to his cervical area. Plaintiff also reported a level of pain of approximately five while on the hydrocodone as prescribed.  (Tr. 899).  In a treatment record dated November 28, 2011, Plaintiff reported that he continued the hydrocodone as prescribed and the level of pain was ranging anywhere from a five to seven.  (Tr. 898).  In a treatment record dated December 23, 2011, Plaintiff reported that he continued the hydrocodone as prescribed and the level of pain was ranging anywhere from a three to seven.  (Tr. 897).  In monthly treatment records from January to March 2012, Plaintiff sought pain management evaluation.  (Tr. 893-896).  During these three examinations, Plaintiff reported pain at a level of four to five while using hydrocodone 10/325 mg no more than two tablets a day.  (Tr. 893-896).

### III.    Legal Standards and Review of ALJ Decision

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected

to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A). A claimant for disability benefits must show that he or she has a physical or mental impairment of such a severity that:

> [H]e is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible for disability benefits. 20 C.F.R. § 404.1520; *accord Plummer*, 186 F.3d at 428. If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. 20 C.F.R. § 404.1520(a)(4). The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant's impairment prevents the claimant from

doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work.  20 C.F.R. §§ 404.1520, 416.920.  Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC").  20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof.  The claimant bears the burden of proof at steps one through four.  *See Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993).  If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Id.*  The ultimate burden of proving disability within the meaning of the Act lies with the plaintiff.  *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

When reviewing the Commissioner's decision denying a claim for disability benefits, the Court must uphold the findings of the Commissioner so long as those findings are supported by substantial evidence.  *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008).  Substantial evidence is a deferential standard of review.  *See Jones v.*

*Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Pierce v. Underwood*, 487 U.S. 552, 564 (1988) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).  Substantial evidence requires only 'more than a mere scintilla' of evidence, *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999) (quoting *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995)), and may be less than a preponderance.  *Jones*, 364 F.3d at 503.  If a reasonable mind might accept the relevant evidence as adequate to support a conclusion reached by the Commissioner, then the Commissioner's determination is supported by substantial evidence.  *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999); *Johnson*, 529 F.3d at 200.

A.     **Whether Substantial Evidence Supports the ALJ's Finding at Step Five of the Sequential Evaluation Process**

Plaintiff contends that substantial evidence does not support the ALJ's finding that Plaintiff is able to sustain substantial gainful activity.  Pl. Brief at 9.  In the July 2012 opinion, The ALJ determined that Plaintiff has the residual

functional capacity to "perform light work as defined in 20 CFR 404.1567(b) after January 1, 2010. [Plaintiff] can never climb ladders, ropes or scaffolds. He can occasionally stoop, kneel, crouch or crawl. He must avoid concentrated exposure to vibration and hazards such as heights and moving machinery." (Tr. 14, 17).[5]

The ALJ observed that:

> By January 4, 2010, [Plaintiff] reported an improvement with the spinal decompression treatments by his chiropractor. He had discontinued his medication and regained the ability to be more functional. In March 2010 he reported doing well with Dr. Shaw the chiropractor and IDD (spinal decompression) therapy. In fact, he deferred surgery because he felt better with decompression treatments. At an appointment on June 22, 2010, he complained of fatigue, but upon musculoskeletal examination there was no tenderness or abnormalities. In November 2010, [Plaintiff] . . . had been getting relief with [the chiropractic] adjustments. A treatment note from November 29, 2010 reports that he has not had any pain medicine in the past year. Every so often, he takes Advil for his neck and right sided discomfort. An examination of his back/spine was negative for posterior tenderness and no abnormalities were noted.

(Tr. 15) (internal citations omitted).  The ALJ also noted that:

> At the consultative examination by Barry Kurtzer, M.D. on January 27, 2011. . . . [Plaintiff] stated that he did not want surgery. [Plaintiff] was examined on June 24, 2011 by Chiropractor Robert Pearl, D.C.

---

[5] In the previous decision dated May, 20, 2010, the ALJ determined that beginning on January 2, 2010, Plaintiff had a residual functional capacity for a full range of sedentary work.  (Tr. 48, 55).

> [Plaintiff] stated . . . that he was now contemplating neck surgery. An examination found him to have decreased range of motion. On September 1, 2011, he returned to pain management after 2 years. [Plaintiff] gave a history of chiropractic treatment that was very helpful but his insurance will no longer pay. . . . On September 30, 2011 [Plaintiff] was awaiting a surgical intervention with Dr. Naseef.

(Tr. 15-16) (internal citations omitted).  The ALJ concluded that:

> Despite recommendations from two surgeons, [Plaintiff] has chosen to not yet have surgery. The findings on examination do not support disability and he was saying the chiropractic treatment and medication helped. The doctors suggest that surgery would help his condition and there is nothing to indicate he will not have improvement now that he will be having surgery.

(Tr. 16).

## 1.  Consideration of all the Evidence in the Record for RFC Determination

An ALJ cannot rely only on the evidence that supports his or her conclusion, but also must explicitly weigh all relevant, probative, and available evidence; and provide some explanation for a rejection of probative evidence which would suggest a contrary disposition.  *See Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir.1981).  The ALJ may properly accept some parts of the medical evidence and reject other parts, but must consider

all the evidence and give some reason for discounting the rejected evidence.  *See Adorno v. Shalala*, 40 F.3d 43, 48; *see also Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001); *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 435 (3d Cir. 1999) ("[w]here competent evidence supports a claimant's claims, the ALJ must explicitly weigh the evidence....") (citation omitted); *Yurt v. Colvin*, 758 F.3d 850, 859 (7th Cir. 2014) (reiterating standard forbidding the "cherry-picking" of the medical record).

A residual functional capacity assessment must be based on a consideration of all the evidence in the record, including the testimony of the claimant regarding his activities of daily living, medical records, lay evidence and evidence of pain. *See Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121-22 (3d Cir. 2000). Rarely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant.  *See Doak v. Heckler*, 790 F.2d 26, 29 (3d Cir. 1986) ("No physician suggested that the activity [the claimant] could perform was consistent with the definition of light work set forth in the regulations, and therefore the ALJ's conclusion that he could is not supported by substantial evidence."); 20 C.F.R. §

404.1545(a). "Federal courts have repeatedly held that an ALJ cannot speculate as to a Plaintiff's RFC; medical evidence speaking to a claimant's functional capabilities that supports the ALJ's conclusion must be invoked." *Biller v. Acting Comm'r of Soc. Sec.*, 962 F.Supp.2d 761, 779 (W.D. Pa. 2013) (citations omitted); *see also Gormont v. Astrue*, 2013 WL 791455, at *8 (M.D. Pa. 2013).

In this instance, the ALJ made a residual functional capacity determination of "light work" without citing to any assessment from a physician to support a finding regarding the functional abilities of the claimant. *See Doak v. Heckler*, 790 F.2d 26, 29 (3d Cir. 1986). The ALJ correctly discredited Dr. Naseef's opinion dated April 6, 2009, as the opinion was made during the closed period of disability and not within the relevant time frame after January 1, 2010. (Tr. 16). The ALJ also correctly observed that the chiropractors' opinions were not "acceptable medical sources" pursuant to 20 CFR § 404.1502 and § 416.902. (Tr. 16). Since opinions by non-acceptable medical sources may never be given controlling weight, there is no treating opinion entitled to controlling weight in this case. *See* SSR 06-3p ("[O]nly 'acceptable medical sources' can be considered treating

sources, as defined in 20 CFR 404.1502 and 416.902, whose medical opinions may be entitled to controlling weight"). The ALJ also correctly observed that the conclusory opinions of the ultimate issue of Plaintiff's disability from Drs. Kurtzer, Dwyer, and Vessa were not binding on the ALJ. (Tr. 16); *see* 20 C.F.R. § 404.1527(d)(1)-(2); *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011) ("The law is clear that the opinion of a treating physician does not bind the ALJ on the issue of functional capacity"). However, Social Security Regulation ("SSR") 96-5p emphasizes the importance of the ALJ to make "every reasonable effort to recontact [medical source opinions] for clarification when they provide opinions on issues reserved to the Commissioner and the bases for such opinions are not clear. . . ." SSR 96–5p at *2. The record is absent any indication that the ALJ sought to "recontact" any of the medical sources for clarification of the opinions. The ALJ discredited all of the medical opinions cited in the decision without citing to any medical opinion supporting that Plaintiff was capable of doing "light work," leading this Court to conclude that the ALJ impermissibly relied on speculation or lay interpretation of medical evidence to reach the

conclusion that Plaintiff was capable of doing light work. *See Morales v. Apfel*, 225 F.3d 310, 317-18 (3d Cir. 2000); *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir.1985) (The ALJ may not substitute his own judgment for that of a physician).

Finally, while the ALJ noted the chiropractic records from Dr. Shaw that show the most improvement, the ALJ failed to address the significant deterioration in Plaintiff's symptoms described in Dr. Shaw's treatment records from March 2011 to April 2012. In Dr. Shaw's treatment records from March 2011 to April 2012, Plaintiff reported experiencing: 1) headaches; 2) blurred vision; 3) interrupted sleep due to right side pain; 4) upper back and neck pain radiating into the right extremity; 5) and limited range of motion of the right shoulder. (Tr. 775-859). From March 2011 to April 2012, Dr. Shaw observed that Plaintiff had: 1) palpated joint restriction the cervical spine; 2) extremely restricted right upper cervical spine; and 3) muscle contracture of the levator scapula muscles, the scapula thoracic muscles of the shoulder, the muscles of the upper back, and the trapezius muscle on the right. (Tr. 775-859). While the ALJ noted earlier reports where Plaintiff indicated treatment with Dr. Shaw resulted in improvement of

symptoms, the ALJ failed to address the constant, mostly unchanging deteriorating symptoms recorded in Dr. Shaw's records from March 2011 to April 2012. Moreover, although the ALJ reported when Plaintiff indicated that treatment under Dr. Shaw resulted in improvement, the ALJ did not address the import of a treatment record dated April 10, 2012, wherein Plaintiff indicated that he was regressing over the last several months and that he was not benefiting from Dr. Shaw's treatment as he did in the past.  (Tr. 860).  The Court finds that the ALJ erred in failing to acknowledge these findings.  *See Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994) (requiring that an ALJ must explicitly weigh all evidence and address probative evidence which would suggest a contrary disposition); *accord Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir.1981).

Based on the foregoing, the ALJ's RFC determination is not supported by substantial evidence.

## 2.  RFC from January 2, 2010, to May 20, 2010

In the July 2012 opinion, the ALJ determined that Plaintiff has the residual functional capacity to "perform light work as defined in 20 CFR 404.1567(b) after January 1, 2010." (Tr. 14, 17).   This July 2012 RFC finding, however, directly

conflicts with the RFC from the previous claim decision on May 20, 2010, a decision which the July 2012 ALJ purports not to have reopened and to have adopted.  In the May 2010 decision, the previous ALJ determined that "beginning on January 2, 2010, [Plaintiff] has had the residual functional capacity to perform the full range of sedentary work as defined in 20 CFR 404.1567(a)."  (Tr. 54-55). Without acknowledgment of the apparent conflict, explanation or citation to any law in support of reconsidering Plaintiff's prior RFC, the ALJ's reconsideration of Plaintiff's RFC for the period covered by the initial ALJ decision was not support by substantial evidence.[6]

### 3.  Requirement to discuss borderline age situations

To aid the inquiry of residual work abilities required at step five of the sequential evaluation process, the Secretary has promulgated guidelines on disability determinations that account for four factors; a claimant's physical abilities, age, education, and work experience.  *See* 20 C.F.R., Part 404, Subpart P, Appendix 2.  These Medical–Vocational Guidelines or "Grids," relieve the ALJ of

---

[6] Moreover, the undersigned cannot identify under what grounds the ALJ would have authority to change the RFC is the subsequent decision.  *See* 20 C.F.R. § 404.957(c)(1) (grounds for denial based on res judicata); 20 C.F.R. §§ 404.989, 416.1489  (criteria for reopening a case).

the need to rely on vocational experts by establishing, through rulemaking, the types and numbers of jobs that exist in the national economy where a claimant's qualifications correspond to the job requirements identified by a particular rule. *See Heckler v. Campbell,* 461 U.S. 458, 461–62 (1983); *Stouchko v. Comm'r of Soc. Sec*, 1:12-CV-1318, 2014 WL 888513 at *9 (M.D. Pa. Mar. 6, 2014).   In utilizing the Grids, an ALJ may not mechanically apply the age factor.   *See* 20 CFR § 404.1563(b).  Indeed pursuant to subsection (b) of 20 CFR § 404.1563:

> We will not apply the age categories mechanically in a borderline situation. If you are within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or decision that you are disabled, we will consider whether to use the older age category after evaluating the overall impact of all the factors of your case.

20 CFR § 404.1563(b). Thus, a "borderline age situation" exists when two criteria are satisfied: the claimant's age is "within a few days to a few months of the next higher age category" and "using the higher age category result in a determination of 'disabled' while using the claimant's chronological age would result in a determination of 'not disabled.'" POMS DI 25015.005(D)(4).

Where an individual younger than fifty is limited to sedentary work may be able to perform jobs in the national economy, the Grids require that a person who is fifty or older and limited to be sedentary work (without transferable job skills) be found disabled.  *See* Medical–Vocational Rules 201.00(g) and 201.06 of 20 C.F.R. Part 404, Subpart P, Appendix 2; *accord Weary v. Astrue*, 4:11-CV-01182, 2012 WL 3062261 n.28 (M.D. Pa. July 26, 2012).  A borderline age situation does not require that an ALJ apply the older age category.  However, it does require the ALJ to address the borderline age situation.  *See Cotter,* 642 F.2d at 704; *Fargnoli v. Halter,* 247 F.3d 34, 40 (3d Cir.2001).

Plaintiff was born on September 14, 1962, and thus was classified by the regulations as a younger person through the date of the ALJ decision on July 25, 2012.[7]  20 C.F.R. § 404.1563 (c).  However, because at the time of the ALJ decision Plaintiff was within a few months of reaching the age of fifty, Plaintiff falls within the "borderline situation" contemplated by subsection (b), thus qualifying him as a "person closely approaching advanced age" under subsection

---

[7] Plaintiff was 52 years old when he was last insured for benefits on September 30, 2014.  (Tr. 11, 55).

(d) at the time of the ALJ decision.   20 C.F.R. § 404.1563 (b) through (c).   If Plaintiff had been limited to sedentary work, and classified as a person closely approaching advanced age, he would have been disabled pursuant to the Grids. Thus, the ALJ's failure to explain why he was now able to perform light work, when the prior ALJ found he was able to perform sedentary work, was not harmless.   Because the record does not contain factual findings relevant to the § 404.1563(b) inquiry into whether the Plaintiff was entitled to consideration under Rule 201.00(g), the Court concludes that the ALJ's decision to deny Plaintiff's application for benefits lacks sufficient explanation to permit review by this Court. *See e.g.*, *Kane v. Heckler*, 776 F.2d 1130, 1133 (3d Cir. 1985) ("The few courts to address a mechanical application of the age categories in a borderline situation have remanded the cases to SSA for more individualized determinations"); *Stouchko v. Comm'r of Soc. Sec.*, 1:12-CV-1318, 2014 WL 888513 at *10 (M.D. Pa. Mar. 6, 2014).

The ALJ did not acknowledge Plaintiff's borderline age and thus erred as a matter of law.

### 4.  Credibility Determination of Plaintiff

In the July 2012 opinion, The ALJ placed repeated significance of Plaintiff's refusal to undergo spinal surgery.  (Tr. 15-16).  The ALJ does not directly explain how Plaintiff's refusal to undergo spinal surgery supports a finding that Plaintiff is not disabled, however, the ALJ mentions the lack of surgery immediately after stating that Plaintiff was not credible.  (Tr. 15).[8]

Before drawing an adverse inference from a claimant's refusal to undergo recommended surgery, the ALJ must consider any explanations that a claimant may provide, or other information in the case record, which may explain a claimant's refusal to undergo surgery.  *See* SSR 96-7p; *Smith v. Astrue*, 961 F. Supp. 2d 620, 654 (D. Del. 2013).  In this instance, the ALJ did not consider any explanation for why Plaintiff declined surgery.  The Court notes that in a record dated September 24, 2009, Dr. Naseef explained that the risks of surgical intervention included "bleeding, infection, need for further surgery, chronic pain,

---

[8] Similarly, immediately following the credibility finding, the ALJ wrote that at Plaintiff's last hearing, "he asked for a closed period of disability, indicating that his condition had improved with chiropractic treatment. He claims that his pain returned when he stopped chiropractic treatment because his insurance would no longer pay for it." (Tr. 15).  Although the ALJ noted Plaintiff's previous improvement following the closed period, there was no explanation of the significance of this fact and it is unclear whether the ALJ intended to indicate that Plaintiff's request for a closed period and subsequent improvement adversely impacted Plaintiff's credibility. (Tr. 15).

failure of the surgery to relieve the pain, pseudoarthrosis, blood clots, death, paralysis, and blindness." (Tr. 347). The ALJ did not address the stated risks or other possible explanations for Plaintiff's refusal to seek spinal surgery before drawing an adverse inference.

Then the ALJ concluded that "[d]espite recommendations from two surgeons, he has chosen to not yet have surgery. . . . The doctors suggest that surgery would help his condition and there is nothing to indicate he will not have improvement now that he will be having surgery." (Tr. 16). The Court notes that the ALJ explicitly adopts the closed period finding for disability from January 2008 to January 2010, and states that the issue of the closed period would not be reopened. (Tr. 11). The recommendations from Dr. Dwyer in May 2009 (Tr. 322) and Dr. Naseef in September 2009 (Tr. 347), existed when the prior determination was made that Plaintiff was disabled for the closed period. For the ALJ to use the same evidence to draw an opposite conclusion would implicitly reopen the record as to the prior closed period decision. Although in medical records after January 2010, Plaintiff mentioned the medical history of prior surgical recommendations, there are no medical records providing opinions for surgery during the relevant

decision period after January 1, 2010.

The effect of the ALJ's finding is similar to the impact of a finding under 20 C.F.R. § 404.1530 which requires a claimant to undergo prescribed treatment if the specified treatment could restore a claimant's ability to work.  Subsection (c)(4) of 20 C.F.R. § 404.1530 contemplates acceptable reasons for failure to follow prescribed treatment as including "treatment because of its magnitude (e.g., open heart surgery) . . .  or other reason is very risky . . ." 20 C.F.R. § 404.1530 (c)(4).  In applying 20 C.F.R. § 404.1530, Courts have found that a claimant who refuses to proceed with surgery should not be denied disability benefits if there are good reasons not to undergo the surgery, including weighing the risks involved with the surgery.[9]  As such, if the ALJ would be precluded from denying Plaintiff benefits

---

[9] *E.g. Wingo v. Bowen*, 852 F.2d 827, 831 (5th Cir. 1988) ("the Secretary must first determine that the reason for declining treatment was not justified by the inability to pay or ineffectiveness of the treatment); *Schena v. Sec'y of Health & Human Servs.*, 635 F.2d 15, 19-20 (1st Cir. 1980); *Blankenship v. Califano*, 598 F.2d 1041, 1045-46 (6th Cir. 1979); *Nichols v. Califano*, 556 F.2d 931, 933 (9th Cir. 1977) ("A patient may be acting reasonably in refusing surgery that is painful or dangerous"); *McCarty v. Richardson*, 459 F.2d 3, 4-5 (5th Cir. 1972) ("we do not perceive it to be a claimant's burden to undergo any and all surgical procedures suggested by her physician lest she be barred from disability benefits"); *see Boyd v. Bowen*, 710 F. Supp. 1046, 1048 (E.D. Pa. 1989) (Where claimant said he could not afford to pay any of his medical bills and testified that he was afraid to undergo back surgery because of an adverse reaction from the myelogram, ALJ determination that a claimant was not disabled and retained residual functional capacity to

under section 404.1530, it reasons that the ALJ should be precluded from denying benefits based on Plaintiff's refusal to undergo spinal surgery when the ALJ does not address Plaintiff's reason for refusal.

Based on the foregoing, the ALJ erred in drawing adverse inferences from Plaintiff's decision not to undergo surgery.

## IV.    Recommendation

Accordingly, it is HEREBY RECOMMENDED:

1.    The decision of the Commissioner of Social Security denying Plaintiff's social security disability insurance be vacated and the case remanded to the Commissioner of Social Security to develop the record fully, conduct a new administrative hearing and appropriately evaluate the evidence in accordance with the Court's above report; and

2.    The Clerk of Court close this case.

The parties are further placed on notice that pursuant to Local Rule 72.3:

---

perform light work was not supported by substantial evidence, even though had refused back surgery and was not taking pain medication or seeing a physician).

Any party may object to a Magistrate Judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof.  Such party shall file with the clerk of court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections.  The briefing requirements set forth in Local Rule 72.2 shall apply.

A Judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.  The Judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record.  The Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

Dated: January 28, 2015

s/Gerald B. Cohn

GERALD B. COHN
UNITED STATES MAGISTRATE JUDGE